**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 16-232 (KBJ) |
| | ) | |
| EDGAR MADDISON WELCH, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## SENTENCING MEMORANDUM

Mr. Edgar Maddison Welch, through undersigned counsel, respectfully submits this

memorandum requesting that the Court consider his entire life and the various legal arguments

made in this sentencing memorandum in determining a fair and just sentence.

### Misguided and Reckless Approach with the Intention of Saving Children

Mr. Welch made an incredibly ill-advised decision to try and save children who he

sincerely believed were being held against their will at a popular pizzeria located in Washington,

D.C.  Mr. Welch's actions were terrifying to those inside the restaurant, as well as to those who

were not present that day, but have been and continue to be victimized by false accusations

involving a conspiracy about child sex abuse.  Mr. Welch deeply regrets his actions and further

sincerely regrets the trauma and fear he instilled to all of those who have been affected by his

actions on December 4, 2016.  Mr. Welch respectfully submits that he is

*truly sorry for endangering the safety of any and all bystanders who were present that day. Unfortunately, I cannot change what I did, but I think I owe it to the families and the community to apologize for my mistakes.*

In an attempt to provide answers about why he engaged in the reckless behavior he engaged in

on December 4, 2016, Mr. Welch notes that he

*came to D.C. with the intent of helping people*

He further notes that he

*felt very passionate about the possibility of human suffering, especially the suffering of a child, and was prompted to act out without taking the time to consider the repercussions of my actions, or the possible harm that might come from them. I am*

Mr. Welch has expressed

*Sincere regret for any emotional trauma I might have caused, especially to the families who were present. It was never my intention to harm or frighten innocent lives, but I realize now just how foolish and reckless my decision was.*

Mr. Welch does not seek to minimize the impact his reckless and frightening actions had on

those who encountered him on December 4, 2016.  Rather, Mr. Welch is hopeful that those

victimized by his actions can forgive him.

## <u>ARGUMENT</u>

Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, **recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.**  (Emphasis added).

With that limitation and considering all of the purposes of sentencing, this Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]."  18 U.S.C. § 3553(a).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).  Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.

Mr. Welch submits that after reviewing all of the applicable factors set forth in § 3553(a), an eighteen month term of incarceration would be appropriate and consistent with the purposes of sentencing and that any sentence of imprisonment exceeding eighteen months would be greater than necessary to meet the sentencing purposes set forth in § 3553(a)(2).

### Factors Under § 3553(a) Warrant An Eighteen Month Term of Imprisonment

The four traditional goals of sentencing are just punishment, deterrence, incapacitation, and rehabilitation.  *See Rita v. United States*, 551 U.S. 338, 348 (2007).  When deciding what sentence best meets these goals, the court is to consider the guidelines and first calculate the appropriate offense level under the guidelines.  However, the Supreme Court has stated that

3

when a Guidelines sentence fails to properly reflect § 3553 considerations or the Guidelines

reflect an "unsound judgment" then a below-guidelines sentence is appropriate. *See id.* at 351,

357.  Here the guideline range applicable to the federal offense of Interstate Transport of a

Firearm and Ammunition is 18 to 24 months. *See* PSR ¶ 109, pg. 22.  The D.C. Voluntary

Guidelines, which are not binding on this Court, applicable to Count Two result in a guideline

range of 18 to 60 months. *See* PSR ¶ 111, pg. 22.  Given the unique circumstances involved in

Mr. Welch's case, a low-end, concurrent, and guideline compliant sentence is appropriate.

Therefore, Mr. Welch requests that this Court impose concurrent terms of eighteen months on

each charge in which he accepted responsibility and pled guilty.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Welch

In 1988, Mr. Welch was born in North Carolina where he was raised by his parents,

Harry Welch, Jr., and Terri Welch. *See* PSR ¶ 58-62, pgs. 12-13.  Mr. Welch is the youngest of

three children born to his parents.  As the youngest child, Mr. Welch looked up to his older

siblings – a brother, who was eight years older, and a sister, who is four years older.  For the first

eight years of Mr. Welch's life, he and his family of five were living a typical middle class

lifestyle in Salisbury, North Carolina, and they shared a close family bond.  However, at the age

of nine, the life that Mr. Welch and his family had known all changed.

Tragically, at the age of nine, Mr. Welch lost the older brother he always looked up to

and idolized as a young kid.  Mr. Welch's older brother was 17 years old at the time he was

killed in a car accident.  The loss of his brother and oldest son born to his parents had a profound,

depressing, and catastrophic impact on him and his family. *Id.*  To this day, Mr. Welch can

barely speak about his brother's death without tears appearing in his eyes.  For years following

his brother's death, home was an entirely different environment filled with sadness, fear of the

4

unknown, a heightened roller coaster of emotions, and most notably a sudden emptiness or void that cannot adequately be put into words.

Importantly, Mr. Welch was able to persevere and graduated high school in 2008.  *See* PSR ¶ 80, pg. 18.  Thereafter, Mr. Welch left Salisbury, North Carolina and headed to the beach area to attend Cape Fear Community College in Wilmington, North Carolina.  *Id*.  In addition to taking classes, Mr. Welch held various jobs in the restaurant industry as well as a landscaping company where he thrived in being able to work outdoors.  *See* PSR ¶ 97, pg. 20.  However, after living away from home for about a year and a half, Mr. Welch then returned home to Salisbury, North Carolina in late 2009.

Beginning in late 2009, Mr. Welch began working for the Rowan County Fire Department.  *See* PSR ¶ 80, pg. 18.  He received his emergency medical technician (EMT) certification and thereafter completed courses in firefighting.  *Id*.  Mr. Welch's interest and strong belief in helping those in need finally began to be fully realized.  He enjoyed the work, although many would see that responding to emergency situations may often be filled with sadness, despair, and carnage.  Mr. Welch saw his assistance as an EMT extremely rewarding despite those challenges.  His commitment to helping people in his community was a way for him to 'give back' which is a consistent theme in Mr. Welch's life – a theme of wanting to help others.

Mr. Welch's desire to help those in need is deeply rooted in his sense of purpose.  Mr. Welch's need to help others stems from his deep religious faith and the core mission that he has pursued since his brother's death.  Mr. Welch was raised by his parents who not only strongly encouraged their children to give back, but lived their own lives helping others, and animals, in

their community.  Their commitment to public service, faith, and family, were and continue to

be, tenets of their core values.

### I.        Charitable Works and Commitment to Improving Children's Lives

As noted above, Mr. Welch followed in the footsteps of his parents and became actively

involved in volunteering and working for the local fire department.  *See* PSR ¶ 59, pg. 13 and ¶

80, pg. 18.  As a licensed EMT, he was involved in responding to hundreds of emergency calls

for assistance.  But in Mr. Welch's world, the biggest call for assistance came when the country

of Haiti was hit with a devastating earthquake and the multiple aftershocks that followed in

January 2010.  According to members of his church and news reports, hundreds of thousands of

Haitians had lost their lives and the need for emergency assistance was vital.  Mr. Welch

immediately welcomed the opportunity to assist in this humanitarian effort and was eager to put

his EMT skills to good use.  In a mission trip sponsored by his church, Mr. Welch volunteered

his time and assisted the Haitian people for three weeks.  *See* PSR ¶ 96, pg. 20.

In addition to rendering medical treatment, Mr. Welch also assisted in rebuilding an

orphanage and further assisted in caring for orphaned children in Haiti.  The entire country had

been devastated and tens of thousands of children were left without parents or any family

members to care for them.  *See* http://www.nbcnews.com/id/34934553/ns/world_news-

haiti/t/haiti-quake-creates-thousands-new-orphans/#.WT6692eGO70  As soon as Mr. Welch

arrived in Haiti he did all in his power to assist in the care of these children.  As stated in his

letter to this Court by Pastor Kelly Fleury,[1] when Mr. Welch arrived, Mr. Welch "did more than

what we expected from him."  Because the situation was so dire, Mr. Welch would forego eating

and give his food to the children instead.  When Pastor Fleury noted that Mr. Welch was losing

weight because he was not eating, Mr. Welch's response was "the children need to be nourished

---

[1]        A copy of his letter is attached to this memorandum as an exhibit.

more than I am."  Mr. Welch wanted desperately to bring some of these orphaned children back to the United States with him upon his return.  He also tried to extend his trip to no avail.  As stated by his mother in her letter to this Court,[2] Mr. Welch was so moved by the people of Haiti and their plight, "he tried to get an extension to stay and help more, but when it was not available, he called us and begged to bring 3 children back with him!  He left everything he owned but the clothes on his back."

Mr. Welch has continued his assistance to the people of Haiti upon returning to North Carolina.  Pastor Fluery notes that despite the years that have passed since the devastating earthquake of 2010, Mr. Welch has continued to keep in touch and provide financial assistance despite his limited income.  The impact that these Haitian children had on the life of Mr. Welch was profound and continues to this day.  His concern and care for children is a driving force in his life -- a driving force that has been a bedrock principle to his core values.

After his experience of assisting the people and children of Haiti, Mr. Welch continued to assist those in need back at home.  He continued to devote his personal time to his community as a member of his church and volunteering at various homeless shelters and soup kitchens.  As evidenced by the various letters attached to this memorandum, Mr. Welch is a very generous person who has a huge heart for helping others.

Mr. Welch's charitable acts reveal his true internal compass and his character which is what 18 U.S.C. § 3553(a)(1) directs courts to consider.  *See United States v. Warner*, 792 F.3d 847 (7th Cir. 2015)(affirming probationary sentence despite guideline range of 46 to 57 months due to exceptional acts of charity and demonstrated concern for the welfare of others); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)(affirming probationary sentence despite guideline range of 12 to 18 months due to, in part, extensive charitable works); *United States v. Cooper*,

---

[2]        A copy of her letter is attached to this memorandum as an exhibit.

394 F.3d 172 (3d Cir. 2005)(four level downward departure was warranted because of defendant's exceptional good works which included mentoring, coaching, and hands-on personal sacrifices); *United States v. Kuhn*, 351 F.Supp.2d 696 (E.D.M.I. 2005)(downward departure was warranted based on community service record that extended beyond financial contributions and took defendant outside heartland of offenders); *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005)(affirming six level downward departure for extraordinary public service and good works where defendant demonstrated his commitment to helping people in distress was instinctive part of his character); *United States v. Greene*, 249 F.Supp.2d 262 (S.D.N.Y. 2003)(defendant was entitled to seven level downward departure based on combination of his charitable work/community service and extraordinary family circumstances); and *United States v. Mehta*, 307 F.Supp.2d 270 (D. Mass. 2004)(five level downward departure granted based on charitable or public service and similar prior good works).

## II.   Extremely Devoted and Involved Parent

In addition to Mr. Welch's strong feelings to protect and provide for those in need, Mr. Welch is an extremely devoted and involved parent to his two daughters. Prior to his arrest, Mr. Welch was the primary parent to his girls who are four and seven years old. *See* PSR ¶ 64-65, pg. 14. Although his seven year old daughter is not biologically his, Mr. Welch has raised her as his own and he is the only father figure she has ever known. In each letter submitted to this Court, the writer comments about his devotion to his children. Despite his separation and ultimate divorce from the mother of his children, Mr. Welch did everything possible to provide a stable, supportive, and loving environment for his daughters. Prior to his arrest, Mr. Welch was the primary provider to his children and they, practically speaking, lived with him full-time. Since his incarceration, Mr. Welch has only spoken to them a few times – the last time being

Christmas of 2016.  The consequence of not being able to see, let alone, speak with his daughters has been one of the most painful consequences of his actions.  Mr. Welch's number one priority upon release from custody is to find a way to see the girls.   "It is not the case that [incarcerated parents] were already disengaged from their children's lives. For example, in 2007, approximately half of parents in state prisons were the primary provider of financial support for their children – and nearly half had lived with their children - prior to incarceration." Melissa Kearney et al., The Hamilton Project, *Ten Economic Facts about Crime and Incarceration in the United States* 14 (2014).  *See* https://www.brookings.edu/research/ten-economic-facts-about-crime-and-incarceration-in-the-united-states/

Mr. Welch is eager to return to being an involved father and he is concerned about the lack of contact he, along with his family, has had with his daughters.  Children of incarcerated parents are more likely to experience financial hardship, residential instability, changes in caregiver arrangements, and trauma associated with the loss of a loved one, all of which may translate into short- and long-term mental and physical health issues, poor academic performance and achievement, substance abuse, and delinquency." Akiva M. Liberman & Jocelyn Fontaine, Urban Institute, *Reducing Harms to Boys and Young Men of Color from Criminal Justice System Involvement* 10 (Feb. 2015), http://www.urban.org/sites/default/files/alfresco/publication-pdfs/2000095-Reducing-Harms-to-Boys-and-Young-Men-of-Color-from-Criminal-Justice-System-Involvement.pdf.

Importantly, because of Mr. Welch's incarceration, his ex-wife now has full custody of the girls and is not even allowing grandparent visitation with Mr. Welch's parents.  The abrupt change in caregiving arrangements has left the girls with many unanswered questions.

### III.     Extreme Remorse and Acceptance of Responsibility

After engaging in his criminal conduct, and realizing that no children were being harmed, Mr. Welch purposefully laid down his weapons in separate locations from one another inside the restaurant and peacefully surrendered to the police outside.  A picture of his surrender and his compliance with all commands of law enforcement is depicted below.



Since his peaceful surrender, Mr. Welch has been unwavering in his acceptance of responsibility. At no point has Mr. Welch denied his wrong doing.  Prior to an attorney being appointed to assist him in this case, he met with law enforcement officials to answer questions about his conduct. Further, Mr. Welch agreed to forego his right to a detention hearing, waived his rights under the Speedy Trial Act on numerous occasions, and entered a timely guilty plea.

Mr. Welch is extremely remorseful for his conduct in this case.  As evidenced by his handwritten letter, Mr. Welch sincerely apologizes to those that were affected by his actions and wholeheartedly regrets any emotional trauma he may have caused.  *See* Exhibit - Letter by Mr. Welch.  In a New York Times article written just three days after his arrest, Mr. Welch admitted that his heart was breaking over the thought of innocent people suffering when he engaged in this conduct in an effort to rescue children.  *See* https://www.nytimes.com/2016/12/07/us/edgar-welch-comet-pizza-fake-news.html?_r=0   Mr. Welch further noted that he acted in "haste" and regretted how he handled the situation.  *Id*.  Upon reflection, Mr. Welch realizes that he should have been much more thoughtful about his overriding concerns for the safety and well-being of children and is ashamed of engaging in this reckless conduct.

### IV.    Publicity and Conditions of Confinement

As this Court is aware, Mr. Welch's case has received an enormous amount of press coverage.  Notwithstanding the public shaming that Mr. Welch has endured, the notoriety of his case based on the extreme amount of publicity coverage of his conduct led to security concerns related to Mr. Welch's confinement at the D.C. Jail.  These security concerns were so significant that the authorities at the D.C. Jail detained him in solitary confinement for approximately five weeks.  The conditions of solitary confinement at the D.C. Jail require 23 hours a day, lock down status in a single cell.  Notwithstanding the regulation that allows for one hour per day that is to be allotted for showering, grooming, and contact with the outside world, those who have been confined to solitary conditions at the D.C. Jail have endured 24 hours a day lock, down status, as was the case with Mr. Welch.  For someone like Mr. Welch, who had never served a day in jail, these 24 hours per day, lock down status in solitary confinement were severe, punitive, and deplorable.

Consideration of pre-sentence confinement is an appropriate consideration under 18 U.S.C. § 3553(a), so that the Court may impose a sentence "sufficient, but not greater than necessary," as required by *United States v. Booker*, 543 U.S. 220, 260 (2005). For a defendant who faces more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect. A low-end, guideline compliant sentence is warranted because at least one of the purposes of sentencing - just punishment – is satisfied by a shorter sentence. In light of this severe confinement setting, it is appropriate for the Court to consider the harsh nature of the defendant's incarceration when determining the sentence. *See United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (downward departure granted due to 13 month pre-trial confinement in overcrowded local facility because "qualitatively different conditions than those of pre-sentence detainees in federal facilities operated by the Bureau of Prisons"); *United States v. Mateo*, 299 F.Supp.2d 201, 212 (S.D.N.Y. 2004) (downward departure granted where pre-sentence conditions "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines"); *United States v. Sutton*, No. 07-426, 2007 WL 3170128 (D.N.J. Oct. 25, 2007) (stating "the logical way of acknowledging [the defendant] was punished 'more than was necessary' under conditions that violate one of the goals of a reasonable sentence [] is to reduce the extent of the overall sentence he must serve").

Solitary confinement has been one of the factors considered by courts in assessing the punitive effects of pre-trial confinement. *United States v. Pressley*, 473 F.Supp.2d 1303 (N.D.Ga. 2006) (downward departure granted when defendant spent six years in pre-sentence confinement, of which five years were in 23 hour a day lockdown); *United States v. Noriega*, 40

F. Supp.2d 1378, 1379 (S.D. Fla. 1999) (court reduced sentence by 10 years in part because of the harsh nature of the defendant's incarceration – "[t]here is little question that [segregated confinement] is a more difficult type of confinement than in general population. For some, the consequences of such deprivation can be serious").

Solitary confinement severely affects the psychological health of the one confined.  The most common psychological effects include anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis. *See Perception Profiling and Prolonged Solitary Confinement Viewed Through the Lens of the Angola 3 Case: When Prison Officials Become Judges, Judges Become Visually Challenged, and Justice Becomes Legally Blind*, 39 Hastings Const. L.Q. 763, 770 (Summer 2012).  Even after only a few days, solitary confinement will "predictably shift the electroencephalogram (EEG) pattern, or brain waves [of a confined person's brain] toward an abnormal[ly slow] pattern characteristic of stupor and delirium." *See Stuart Grassian, Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006).  Also, "the evidence strongly suggests that use of solitary confinement during the early phases of imprisonment increases the suicide risk and most likely also raises the likelihood of incidents of self-mutilation." *See Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime and Just. 441, 500 (2006).

Given the harsh pre-trial confinement conditions of solitary confinement that Mr. Welch endured for over five weeks, this Court should consider Mr. Welch's suffering and ultimate deprivation from his ability to interact with others when determining an appropriate sentence.

Case 1:16-cr-00232-KBJ   Document 25   Filed 06/13/17   Page 14 of 19


**B.      The Need for the Sentence Imposed**

**I.      Punishment Will Reflect the Seriousness of the Offense**

An eighteen month term of incarceration is a lengthy period of incarceration, particularly

for Mr. Welch since he previously has not been imprisoned.  Mr. Welch will further be subject to

a five year term of supervised release to follow.   On supervised release, Mr. Welch will be

subject to a strict regimen of supervision which will require regular reporting to a probation

officer who will be able to assist him in reentering the community.  Importantly, Mr. Welch's

conviction and stamp as a convicted felon will prevent him from possessing firearms – a

significant punishment that he will carry with him for the rest of his life.  This collateral

consequence and preclusion from ever possessing a firearm in the future is a significant and

important collateral consequence to his actions.

Mr. Welch has lost custody of his children.  This collateral consequence – the inability to

see and care for his children – has and will continue to sanction him more severely than a finite

period of incarceration.  Mr. Welch has stated that his number one goal upon release from

custody is to work at rebuilding his ability to see his children and hopes to one day have joint

custody.  Currently, Mr. Welch's ex-wife will not allow contact between him and his two

daughters and as a result of that action, Mr. Welch has not been able to speak with either of his

children since Christmas.  Mr. Welch is relying on the strength and presence of his sister and

parents to continue the family relationships with his girls and hopes through their perseverance,

he will be able to reconnect with them soon.

As evidenced by various studies, fathers who maintain relationships with children are less

likely to recidivate.  *See* Solangel Maldonado, *Recidivism and Parental Engagement*, 40 Family

L. Q. 191 (2006) ("The literature … suggests that exconvicts who share close relationships with

their children are less likely to recidivate than those who do not.").   Further, the "single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return.  Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties." *Id*. at 196-97.   Parents with "less time to serve reported more frequent contact with their children" than those serving longer prison sentences; and "about half (47%) of parents who expected to be released within six months reported at least weekly contact with their children, compared to 39% who expected to be released in 12 to 59 months, and 32% in 60 or more months." *See* Lauren E. Glaze & Laura M. Maruschak, Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, *Parents in Prison and Their Minor Children* (2010), http://www.bjs.gov/content/pub/pdf/pptmc.pdf.

## II.      Need to Afford Adequate Deterrent Effect

Since his involvement in these criminal actions, Mr. Welch has expressed embarrassment, shame, and disappointment in himself and his actions.  The U.S. Sentencing Commission has previously stated, "there is no correlation between recidivism and Guidelines' offense level" which is "not intended nor designed to predict recidivism."  *See U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 13 (2004).  Further, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White*

*Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.  *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/Sentence.pdf.  That study found correlation between sentence severity and crime rates was not sufficient to achieve statistical significance.

"[T]here is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs."  Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).  "[L]engthy prison sentences cannot be justified on a deterrence-based, crime prevention basis." *Id.* at 202.  "[E]vidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. . . . The evidence in support of certainty's deterrent effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent. . . . Thus, this revised conclusion about the deterrent effect of punishment certainly should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects."  *Id.* at 201-202.

Mr. Welch submits that he has been deterred but it appears that the public at large, notwithstanding the publicity about his guilty plea, may still harbor some beliefs that the conspiracy involving the sex trafficking of children still exists.  *See*

https://www.washingtonpost.com/news/local/wp/2017/03/25/protesters-outside-white-house-demand-pizzagate-investigation/?utm_term=.639eee314a0e

### III.    Need to Protect the Public from Further Crimes

It is highly unlikely that Mr. Welch will engage in future criminal activity as he has expressed sincere remorse and insight into his reckless decisions in this case.  Mr. Welch submits that he did not intend to frighten innocent bystanders who were inside the restaurant on December 4, 2016.  However, Mr. Welch realizes how traumatizing his actions were.  As stated above, Mr. Welch no longer has the right to possess any type of firearm, so this type of reckless behavior will never again occur.  Further, Mr. Welch does not intend to ever return to the D.C. area.  Mr. Welch intends to focus on rebuilding his relationships with his children as well as other family members and friends who have been harmed in a variety of ways by his actions.  Mr. Welch assures this Court, as well as those victimized in this case, that his prior foolish decisions are now behind him.  In sum, the imposition of an eighteen month term of incarceration followed by a five year term of supervised release[3] can protect the public and achieve adequate deterrence.

### IV.    A Sentence of Eighteen Months Incarceration is Not an Unwarranted Sentencing Disparity

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that

---

[3]       If this Court imposes an eighteen month term of incarceration on Count Two, this Court shall impose a term of supervised release of five years.  *See* PSR ¶ 120, pg. 23.

are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Mr. Welch respectfully notes that while every case is different, a sentence of 18 months imprisonment – a low-end, guideline compliant sentence is appropriate.  Undersigned counsel was able to find two cases adjudicated in 2016 that are instructive on the issue of unwarranted disparity for conduct that involved the use of firearms and confrontation with law enforcement. In *United States v. Larry Russell Dawson*, Cr. No. 16-151 (JEB), Mr. Dawson pointed an imitation gun at law enforcement officers as he was being screened for entry at the United States Capital Center.  In imposing a mid-range, guideline compliant sentence of 11 months incarceration on the federal offense, the Court factored a variety of factors, including remorse and an expression of never returning to the D.C. area – an expression that Mr. Welch shares. Another case instructive on the issue of unwarranted disparity that involves the firing of a gun and confrontation by law enforcement is *United States v. Olivieri*, Cr. No. 16-135 (RCL). Notably, the conduct in Mr. Olivieri's case is even more egregious than Mr. Welch's conduct in that Mr. Olivieri fired a shot from a pistol on Constitution Avenue near the White House.  After firing the shot on a public street filled with innocent bystanders, he then walked towards the security gates at the White House with the loaded pistol in his hands.  The Court in Mr. Olivieri's case imposed a sentence of time served – four and a half months after the commission of the offense.  While every case is different, as are the characteristics of each defendant, the above mentioned cases were the most similar undersigned counsel could find to demonstrate that a low-end, guideline compliant sentence of eighteen months is not an unwarranted sentencing disparity.

## **CONCLUSION**

A sentence of eighteen months incarceration is a serious consequence that will more than adequately punish Mr. Welch for his particular conduct and will also adequately deter any future wrongful conduct. Thus, for the reasons stated above, Mr. Welch's history and characteristics, together with the other goals of sentencing, Mr. Welch respectfully requests that the Court impose a sentence of concurrent eighteen months on each count. The stigma of a criminal felony record, exposure to an eighteen month period of confinement, and restitution promotes respect for the law and provides just punishment in light of the seriousness of the offense.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500